IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| D. MIKE BOYD, | * | |
| Plaintiff, | * | |
| vs. | * | CASE NO. 3:05-CV-37(CDL) |
| | * | |
| GEORGIA DEPARTMENT OF PUBLIC SAFETY; SONNY PERDUE, and GEORGE A. ELLIS, | * | |
| | * | |
| Defendants. | * | |
| | * | |

O R D E R

Plaintiff D. Mike Boyd asserts a claim for First Amendment retaliation against his former employer, the Georgia Department of Public Safety ("DPS"), his former supervisor, George A. Ellis, and Governor Sonny Perdue.[1] Because Plaintiff's speech is not entitled to First Amendment protection, Defendants' presently pending Motion for Summary Judgment (Doc. 16) is granted.

FACTUAL BACKGROUND

Plaintiff claims that he was constructively discharged from the Georgia State Patrol ("GSP") in retaliation for statements he made concerning the operation and misuse of GSP helicopters. The relevant facts, when viewed in the light most favorable to Plaintiff, are as follows:

---

[1] Plaintiff also asserts a claim under the Georgia whistleblower statute, O.C.G.A. § 45-1-4(d).

Plaintiff served as commander of GSP's aviation division from February 1, 2002 to May 14, 2003. As division commander, Plaintiff "had supervisory authority over the pilots assigned to fly [GSP] helicopters," (Compl. ¶ 6), and was "responsible for the safe maintenance and operation of [GSP] aircraft . . . ." (Pl.'s Resp. Defs.' Mot. Summ. J. 28 n.15.) Additionally, Plaintiff was required to make GSP aircraft available to the Governor of the State of Georgia for use in connection with official state business.

Defendant Perdue was elected Governor in November 2002. Shortly thereafter, he requested a helicopter transport with Jeff Rhodes, an aviation division pilot who had been detached from that unit to serve on the Governor's executive security detail. While assigned to the Governor's security detail, Rhodes was not under Plaintiff's supervisory authority; however, he did have to obtain Plaintiff's permission to fly Governor Perdue in a GSP helicopter.

Plaintiff approved Rhodes's flight and scheduled it for December 11, 2002. On the day of the flight, "Plaintiff learned that a second stick . . . was installed in [the] helicopter" and "believed that the presence of a [dual control] in that particular helicopter was unsafe in the absence of a licensed co-pilot or a licensed instructor pilot []." (*Id.* at 4.) Concerned about the potential safety hazard of having Governor Perdue in the co-pilot's seat, "Plaintiff ordered Rhodes to remove the second [control] stick before embarking." (Compl. ¶ 8.)

2

Rhodes, however, disobeyed Plaintiff's order and took off without removing the second stick control. During the flight, Rhodes permitted Governor Perdue to take control of the helicopter "to [get the] feel of it."[2] (Rhodes Depo. 11:13.) He also expressed to the Governor that he "had some concern with [Plaintiff]'s leadership" and the way Plaintiff "handled people" and "talked down to them." (Perdue Depo. 15:13-14; Rhodes Depo. 9:12-13, 13:22-14:15.) Upon learning of Rhodes's apparent insubordination, Plaintiff spoke with the executive security supervisors expecting that they would "[s]top [Rhodes] from flying." (Pl.'s Depo. 26:3, Jan. 31, 2006.) Instead, Rhodes's supervisors informed Plaintiff that he "could give [Rhodes] permission [to fly] or not" and "that they were not going to call the flights for the State Patrol, that [Plaintiff] could call them." (Pl.'s Depo. 23:7-8, 23:2-3, Jan. 31, 2006.)

Intimidated by Rhodes's position with the Governor's office, Plaintiff continued to allow Rhodes to pilot the Governor's flights despite his refusal to remove the second stick control. In late 2002, however, Plaintiff reported Rhodes's defiance to Defendant Ellis, the commissioner of the Department of Public Safety and colonel of GSP. Plaintiff informed Defendant Ellis that Rhodes (1) "was taking a risk [that Plaintiff] didn't want to be liable for" and (2) "had put [Plaintiff] in a bad position . . . [by] using his

---

[2] Although Governor Perdue is not licensed to fly helicopters, he does "have [a] single- and multi-engine land with commercial/instrument [fixed wing license]." (Perdue Depo. 21:25-22:3.)

3

position there at the Governor's office to sidestep [Plaintiff's] authority." (Pl.'s Depo. 27:21-22, 23:18-20, Jan. 31, 2006.) Although Defendant Ellis does not specifically remember these meetings, he concedes that he told Plaintiff to "do the right thing" when deciding whether to allow Rhodes to continue to fly. (*See* Ellis Depo. 20:16-20.)

Plaintiff believes that Governor Perdue knew about his comments to and about Rhodes. Specifically, Plaintiff believes that Rhodes "made an issue out of the [helicopter] controls with the Governor [, who] . . . took it that [Plaintiff] was taking some of his authority away." (Pl.'s Depo. 32:1, 32:10-11, Jan. 31, 2006.) Plaintiff also believes that the Governor "learned of the Plaintiff's communications to [D]efendant Ellis," (Compl. ¶ 13) and subsequently requested that Defendant Ellis "check into" the operation of the aviation division. (Perdue Depo. 15:23-16:13, 18:1-12.) According to Plaintiff, the Governor met with Defendant Ellis "with the expectation that [he] would take action to remove Plaintiff's ability to interfere with [Governor Perdue's] desire to take control of GSP helicopters . . . ." (Compl. ¶ 14.) Plaintiff alleges that as a result of Defendant Ellis's ensuing investigation, he was removed as head of aviation and demoted to a pilot's position.

After his demotion, Plaintiff never returned to work. Instead, he sought a disability retirement based upon a prior job-related back injury. Plaintiff now claims that "[t]he joint actions of

4

[D]efendants" amounted to a constructive discharge. Specifically, Plaintiff alleges that Defendants jointly terminated his employment in retaliation for "his communications prohibiting the placement of a second stick in the helicopters used to transport the Governor, reporting the misuse of state helicopters by the Governor, and objecting to the unlicensed Governor being permitted to control state owned helicopters." (Compl. ¶ 20.) Defendants seek summary judgment, arguing that the speech upon which Plaintiff rests his claim is not protected by the First Amendment.[3]

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of showing that there is no genuine issue of material fact, and may do so by pointing to an absence of evidence to support an essential element of the nonmoving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986). Once the moving party has met its burden, the burden shifts to the nonmoving party to "designate 'specific facts showing that there is a genuine issue for

---

[3]Defendants also argue that there were legitimate, non-retaliatory reasons for the employment actions taken regarding Plaintiff. However, since the Court finds that Plaintiff's speech is not entitled to First Amendment protection, it is unnecessary to address this argument.

5

trial.'" *Id.* at 324. The reviewing court should grant summary judgment only if the combined body of evidence, viewed in the light most favorable to the nonmoving party, would not permit a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

## DISCUSSION

It is well settled that "a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142 (1983). To establish a prima facie case of First Amendment retaliation, Plaintiff must show

> 1) that [his] speech can be fairly characterized as relating to a matter of public concern, 2) that [his] interests as a citizen outweigh the interests of the State as an employer, and 3) that [his] speech played a substantial role in the government's decision to take an adverse employment action.

*Akins v. Fulton County*, 420 F.3d 1293, 1303 (11th Cir. 2005). The first two elements of a prima facie case are designed to determine whether a public employee's speech is protected under the First Amendment. If the speech is not protected, that ends the inquiry and Defendants would be entitled to summary judgment. *See Anderson v. Burke Co.*, 239 F.3d 1216, 1219 (11th Cir. 2001) (internal citations omitted). Therefore, the first issue to be decided is whether Plaintiff's speech in this case is protected under the First Amendment.

6

A public employee's right to speak out on matters of public concern is not absolute. To determine whether such speech is protected under the First Amendment, the Court must balance the employee's interest in engaging in free expression with the government employer's interest in properly managing its employees. *Garcetti v. Ceballos*, __ U.S. __, 126 S. Ct. 1951, 1958 (2006). This balancing seeks "both to promote the individual and societal interests that are served when [public] employees speak as citizens on matters of public concern and to respect the needs of government employers attempting to perform their important public functions." *Id.* at 1959.

As explained by the Supreme Court in *Garcetti*, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 1960. The plaintiff in *Garcetti,* a deputy district attorney, claimed that he was retaliated against because he wrote a memo to his supervisor expressing concern about the validity of a warrant affidavit. *Id.* at 1955-56. The Supreme Court determined that the plaintiff's speech was made "pursuant to his official duties" and therefore was not protected by the First Amendment. *Id.*

As in *Garcetti*, it is clear that Plaintiff's speech in this case was made "pursuant to his official duties" as commander of the GSP

7

aviation division and thus is not protected by the First Amendment. Plaintiff specifically alleges that he was constructively terminated "in retaliation for his communications prohibiting the placement of a second stick in the helicopters used to transport the Governor, reporting the misuse of state helicopters by the Governor, and objecting to the unlicensed Governor being permitted to control state owned helicopters[.]" (Compl. ¶ 20.) Each of these statements relates to the safe and proper operation of aviation property, and Plaintiff admits that, as commander of the aviation division, he was "responsible for the safe maintenance and operation of the [GSP] aircraft . . . ." (Pl.'s Resp. Defs.' Mot. Summ. J. 28 n.15.) Additionally, when asked whether he reported Rhodes's behavior to Defendant Ellis "as part of [his] job duties[,]" Plaintiff responded "[a]bsolutely." (Pl.'s Depo. 30:20-23, Jan. 31, 2006.) It is undisputed that the speech upon which Plaintiff relies in support of his First Amendment retaliation claim was made "pursuant to his official duties," and thus it is not protected speech. Accordingly, Plaintiff cannot establish a prima facie case of First Amendment retaliation, and Defendants are entitled to summary judgment on Plaintiff's First Amendment claim.

CONCLUSION

As explained in this Order, Defendant's Motion for Summary Judgment (Doc. 16) is granted as to Plaintiff's First Amendment retaliation claim. Since this ruling disposes of all of Plaintiff's

federal law claims, the Court declines to exercise jurisdiction over Plaintiff's remaining state law claim. That claim is therefore dismissed without prejudice.

IT IS SO ORDERED, this 2nd day of March, 2006.

S/Clay D. Land<br>
CLAY D. LAND<br>
UNITED STATES DISTRICT JUDGE